UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOHN GIALLANZA,

                            Plaintiff,            07-CV-6050

              v.                                 **DECISION
                                                 and ORDER**

TIME WARNER CABLE,

                            Defendant.
_____

## INTRODUCTION

Plaintiff John Giallanza ("plaintiff" and/or "Giallanza"), proceeding *pro se* brings this action pursuant to the Americans with Disabilities Act of 1990, (codified at 42 U.S.C. §12112 et. seq.) ("ADA")[1] alleging that defendant Time Warner Cable ("defendant" and/or "TWC") failed to provide him with a reasonable accommodation so he could perform the essential functions of his job and that TWC terminated his employment because of his disability. In addition, plaintiff also claims that TWC retaliated against him because he complained about discrimination or harassment that was directed towards him.

Defendant now moves for summary judgment, arguing that no reasonable jury could find that it discriminated against plaintiff as

_____

[1]The *pro se* Complaint filed by plaintiff indicates that the "action is brought for discrimination in employment pursuant to" the ADA. However, in section 14 of the Complaint, plaintiff states that "[d]efendant's conduct is discriminatory with respect to" his "National Origin" as well as disability. While plaintiff has not formally addressed a Title VII claim, defendant has nevertheless addressed the claim in its summary judgment motion.

he claims. Plaintiff has not opposed defendant's motion.[2] For the reasons set forth below, defendant's motion for summary judgment is granted.

## BACKGROUND

Local Rule of Civil Procedure 56.1 requires that the moving party include with its motion for summary judgment a "separate, short, and concise statement of the material facts to which the moving party contends there is no genuine issue to be tried." See W.D.N.Y. Loc. R. Civ. P. 56.1(a). Defendant has complied with this rule. See Docket #33. Plaintiff has not opposed defendant's summary judgment motion and accordingly has not provided "a separate, short, and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried." See W.D.N.Y. Loc. R. Civ. P. 56.1(b). Because the motion is unopposed, the third paragraph of Rule 56.1 comes into play and reads: "[a]ll

---

[2] On June 16, 2008, TWC filed its Motion for Summary Judgment. The Certificate of Service filed by TWC with the Court indicated that a copy of the following documents were served on plaintiff by United States Mail, first class, postage prepaid at the address listed by plaintiff on the Court's docket: Notice of Motion for Summary Judgment, Defendant's Local Civil Rule 56.1 Statement of Undisputed Material Facts, Memorandum of Law in Support of Defendant's Motion for Summary Judgment, Defendant's Appendix to Local Rule 56.1 Statement of Undisputed Material Facts, the Declaration of Richard Reice, the Affidavit of Irene LaBue, and Defendant's Local Rule 56.2 Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment with the Clerk of the District Court using its CM/ECF system. On June 17, 2008, the Court electronically notified TWC that the motion date for the summary judgment motion was set for August 13, 2008. On the same day, August 13, 2008, the Court sent a copy of the notice to plaintiff at the address listed on the Court's docket via first class mail. However, on October 27, 2008, plaintiff sent a fax to Judge Jonathan W. Feldman indicating that he "ha[d] not received any correspondence with respect to [this] case." See Docket # 38, Ex. 1. In the Court's October 28, 2008 Order, the Court noted that the address where TWC sent the summary judgment papers to plaintiff as noted in the Certificate of Service and the address where the Court sent its notice to plaintiff was the very same address plaintiff listed in its faxed letter dated October 27, 2008. Further, the Court did not receive any returned mail from the post office relating to the June 17, 2008 mail it sent to plaintiff notifying plaintiff of the summary judgment motion return date. However, because plaintiff was proceeding *pro se*, the Court ordered TWC to re-serve plaintiff by a verifiable means of service with copies of the summary judgment motion papers and gave plaintiff thirty days to respond. Plaintiff never opposed the motion for summary judgment.

material facts set forth in the statement required to be served by the moving party will be deemed to be admitted *unless* controverted by the statement required to be served by the opposing party." See id. R. 56.1(c) (emphasis added). In view of this provision, the Court deems admitted all of defendant's statements of facts contained in its June 16, 2008 submission. See Docket #33. Accordingly, the undisputed facts are as follows:

**A.    Parties**

TWC provides cable television, high-speed data, telephone and other related services in New York State and operates a media sales office in Rochester. Plaintiff was an Account Executive ("AE") at TWC. Prior to being employed by defendant, he sold advertising space at radio and television stations for over twenty years. As an AE for defendant, his primary job responsibility was to get clients to buy as much advertising space as possible from TWC. The amount of new and incremental media time on a TWC cable channel plaintiff was required to sell is called a "budget."[3] Plaintiff's position as an AE was described as having "essential duties and responsibilities," among others, "to secure new advertising clients," "perform extensive unsolicited calling to develop client list" and "meet defined sales quotas and goals." In addition, the job description states that the

---

[3]According to TWC, if a salesperson "made budget" then they achieved their target. In this regard, while it was not uncommon for a salesperson to occasionally fail to meet budget, chronic failure to meet budget was considered poor performance and grounds for counseling and discipline up to and including discharge. See Declaration of Richard Reice "Reice Decl.", ¶5 (transcript of deposition of Irene LaBue at 85:85).

"physical demands" of the position include making frequent in-person sales calls and driving a car.

## B.    Plaintiff's Recruitment Process at TWC

In January 2004, plaintiff's former supervisor at FOX Television referred plaintiff to Dan Budzinski ("Budzinski"), then a general manager at TWC's Rochester, New York office. Budzinski and plaintiff met on several occasions to discuss the prospects of plaintiff's employment at TWC. During the meeting, plaintiff informed defendant of his sales experience and ability. For instance, he told Budzinski that in one year while working at FOX, he brought in new revenue including $50,000 to $70,000 of new incremental Canadian tourism-related media sales business. After each of the meetings held in February and March plaintiff was offered employment at TWC but each time he declined the offers. Plaintiff determined that the projected commissions were overstated based on the target client list provided by defendant and that his likely income was going to be insufficient.

Two months later, Budzinski informed plaintiff that an AE position was available and so plaintiff met with Budzinski and Irene LaBue ("LaBue"), who was to be his direct supervisor, to discuss the opportunity. At the meeting, Budzinski and LaBue presented Giallanza with a different offer that had varied target clients and accounts as well as the revenue expected to be generated from those accounts. In addition, they discussed ways to generate new business and greater income for plaintiff at TWC, including Giallanza bringing the

Canadian accounts from FOX that he previously mentioned. As a result of the conversation with plaintiff, TWC offered him employment. Plaintiff accepted the position as well as the terms of the offer when he signed the offer letter.

### C.  Terms of Plaintiff's Employment

The offer letter assigned a sales budget of $1,091,434 to Giallanza. If this revenue was met, the budget showed plaintiff earning $115,449.06 in annual salary and commissions, which was to be prorated for 2004. On July 12, 2004, Giallanza commenced his employment at TWC. During his orientation he received a letter indicating that his employment with TWC was at-will and he also received the TWC Employee Handbook and anti-discrimination policies. Between the months of August and December 2004, plaintiff achieved his budget goals.[4]

### D.  Plaintiff's Illness

In January 2005, plaintiff started to develop symptoms of what he thought was a heart condition. In spite of these symptoms plaintiff continued to work and met his budget for January, but he began wearing a heart monitor. However, in the same time period in January 2005, LaBue started noticing that plaintiff was making mistakes that were not typical for an AE with Giallanza's level of experience. Specifically, plaintiff assigned an improper instruction to a client's order concerning when to air a commercial. At the end

---

[4]During this period, plaintiff traveled to Canada three times to generate new business for TWC.

of January 2005, plaintiff informed LaBue that he might have a cardiac related medical condition.[5] By February 2005, plaintiff's undiagnosed medical condition worsened and became so severe that it was difficult for Giallanza to function. For instance, there was a time when plaintiff suffered an attack at the office that led to LaBue driving him home since plaintiff was unable to drive. The chronic attacks caused plaintiff to lose sleep which in turn contributed to more attacks. As a result, plaintiff was absent from work for several days in February 2005. While plaintiff did some work from home, he lacked the ability to focus and his anxiety rendered him unable to drive to appointments. In February 2005, plaintiff sold 63% of his budget.

In March 2005 plaintiff was diagnosed as suffering from general anxiety disorder (and not a cardiac condition), which in turn was causing him to have episodes of severe panic attacks. As a result of the panic attacks, Giallanza was out of the office for nine work days in March. In his absence, LaBue managed his accounts or asked another AE to help plaintiff's clients. However, plaintiff's inability to perform his job became so apparent that on March 14, 2005, a sales manager at TWC wrote to plaintiff expressing concern about plaintiff's failure to meet his budget on the "R News" account. By the end of March plaintiff sold 65% of his budget and brought in a

---

[5] Plaintiff was concerned about the impact the condition was having on him and he asked LaBue if his condition would lead to his termination at TWC and LaBue told him it would not. In addition, LaBue informed him that if his condition caused him to be excused from meetings from time to time, that was acceptable.

marginal amount of new business. It was also during this time that plaintiff confided in LaBue and informed her of his diagnosis of general anxiety disorder. In addition, he provided LaBue with a note from his doctor explaining his illness/disorder. The doctor's note only directed that Giallanza be allowed to work a flexible schedule, which was granted by TWC.

Plaintiff missed another five days of work in April 2005. When plaintiff was in the office, his illness would sometimes prevent him from visiting clients to make sales calls. As a result, plaintiff only sold 59% of his budget for April. At this point, plaintiff had failed to meet his budget three months in a row. In May 2005, plaintiff informed LaBue that his disorder caused him to panic when, among other things, he traveled by plane, drove under or over bridges or crossed railroad tracks and thus he could not engage in those activities. Moreover, from time to time, plaintiff was unable to get to work unless someone picked him up and physically took him there.[6]

When LaBue asked Giallanza if he wanted to take disability, plaintiff stated he did not want to do so. Plaintiff did not ask for any accommodation other than the flexible work schedule recommended by his doctor. However, by May 2005 Giallanza's inability to perform the essential functions of his job became overwhelming. For instance, one TWC client repeatedly complained to LaBue that he left voicemail

---

[6]LaBue notified Giallanza that TWC would try to "work around it" and that they would "see how [Giallanza] do[es]...in the next few weeks and months and go from there." LaBue tried to work with plaintiff to overcome the occasional challenges he faced as a result of his disorder.

messages for plaintiff but he never received a call-back and was unable to communicate with plaintiff concerning sales orders. Accordingly, the client did not want plaintiff servicing his account anymore because plaintiff was not responsive to his needs. In May 2005, plaintiff sold under his monthly budget by 29%. Moreover, between June and September 2005, plaintiff remained fearful of going on sales meetings and traveling.

### E.   Discharge of Plaintiff from TWC

From June through August plaintiff sold under budget i.e. in June 2005 plaintiff sold only 50% of his budget, in July 2005 he again sold only half of his budget and in August 2005 plaintiff was under selling by 27% of his budget. Due to the repeated failures to achieve his budget target, defendant expressed its concerns and dissatisfaction to plaintiff regarding his performance. When confronted about his poor performance, plaintiff admitted to LaBue that given his condition, it would be difficult to complete the required client appointments every week and thus meet his established performance goals going forward. Once again in September 2005, plaintiff fell short of his budget by selling only 43%. Accordingly, on September 28, 2005, LaBue, Budzinski and Shawn LaRose (local Sales Manager for TWC) met with Giallanza and notified him that his employment at TWC was going to be terminated because he failed to meet his budget goals for the past eight months since February 2005 and because it appeared that plaintiff's inability to perform would

continue. Plaintiff's scheduled last day of work was October 27, 2005, almost one month after notification of his discharge.

A few days before plaintiff's scheduled last day, LaBue requested via e-mail that plaintiff meet with her to review his accounts. However, plaintiff refused and stated that he would only meet with Budzinski. When plaintiff arrived at the office LaBue asked two more times that plaintiff meet with her but he still declined. Because of plaintiff's raised voice and hostile behavior, LaBue asked two male AEs to stand in her office to observe her interaction with plaintiff. Shortly thereafter plaintiff voluntarily left the office and went directly to the Human Resources Department where he complained about LaBue's conduct that day as being unprofessional and that TWC discriminated against him by terminating his employment. This was plaintiff's first complaint of discrimination and first complaint regarding anyone at TWC and it came one month after being notified that his employment was being terminated.

When asked at his deposition to substantiate his discrimination claim, plaintiff stated that LaBue's "motive" to discriminate was that "she wanted to find out and gain access to what was going on in [his] life." In addition, Giallanza claimed that LaBue's conduct was discriminatory because LaBue "was not being forthright about taking advantage of [his] situation and condition." He further stated that LaBue's conduct was discriminatory "because [he] was not 100 percent capable of understanding what was going on." Plaintiff testified at

his deposition that the "acts of discrimination" included (1) "taking advantage of a mental illness," (2) "discriminating against [him] because of [his] mental illness," (3) "the simple fact that [he] was terminated," and (4) "the fact that Ms. LaBue used...her ability to have him trust her." However, plaintiff admitted that he does not know exactly what LaBue did to discriminate against him and he acknowledged that he was unable to meet the standards set by TWC. Notwithstanding the fact that he had already been informed of his discharge, plaintiff also asserts that TWC retaliated against him when LaBue tried to embarrass him when he refused to meet with her several days prior to his scheduled last day.

Further, plaintiff contends that TWC may have discriminated against him based on his national origin because he was born in Sicily, Italy. However, plaintiff acknowledged that he is not really sure if LaBue had discriminatory animus against Italians, but that it might be one of the motives she had. Neither LaBue nor any other employee made any comments to plaintiff about his Italian national origin and none of them made any ethnic slurs toward plaintiff.

## DISCUSSION

### I.   Motion for Summary Judgment

The Court may grant summary judgment only where "there is no genuine issue as to any material fact and...the moving party is entitled to a judgment as a matter of law." See Fed. R. Civ. P. 56(c). An issue is genuine if the relevant evidence is such that a

10

reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The nonmoving party must show, by affidavits or other evidence, admissible in form, that there are specific factual issues that can only be resolved at trial. See Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir.1995). "[P]roceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment." See Viscusi v. Proctor & Gamble, 2007 WL 2071546, at * 9 (E.D.N.Y.2007).

In determining whether to grant summary judgment, the Court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." See Scott v. Harris, 550 U.S. 372, 127 S.Ct. 1769, 1776 (2007). "When opposing parties tell two different stories, one of which is

blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." See id. at 1776.

The nonmoving party cannot defeat summary judgment by "simply show[ing] that there is some metaphysical doubt as to the material facts," Matsushita, 475 U.S. at 586, or by a factual argument based on "conjecture or surmise." See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.1991). In this regard, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in the pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir.1994), or on conclusory allegations or unsubstantiated speculation. See Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir.1998).

Summary judgment dismissing an employment discrimination case is warranted only where a plaintiff cannot provide evidence to support an essential element of her claim. See Schnabel v. Abramson, 232 F.3d 83 (2d Cir. 2000); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 764 (2d Cir. 1998). However, where a plaintiff claims he or she is the victim of unlawful discrimination, an award of summary judgment is ordinarily inappropriate. See Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir.1991). As the Second Circuit has recognized, employment discrimination

> is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence. An employer who

> discriminates is unlikely to leave a "smoking gun," such as
> a notation in an employee's personnel file, attesting to a
> discriminatory intent. A victim of discrimination is
> therefore seldom able to prove his or her claim by direct
> evidence and is usually constrained to rely on the
> cumulative weight of circumstantial evidence.

See id. (internal quotations omitted). Nonetheless, to defeat a motion for summary judgment, a plaintiff must rely on more than mere conclusory allegations that the discrimination occurred. "Indeed, the salutary purposes of summary judgment--avoiding protracted, expensive and harassing trials--apply no less to discrimination cases than to commercial or other areas of litigation." See Meiri v. Dacon, 759 F.2d 989,998 (2d Cir.1985).

## II.  **Plaintiff has failed to state a claim under the Americans with Disabilities Act**

Plaintiff alleges that he was terminated as a result of a disability in violation of the Americans with Disabilities Act, codified at 42 U.S.C. § 12101 et. seq. §12112 of the ADA prohibits discrimination against qualified individuals with a disability with respect to conditions of employment including hiring, advancement, discharge and compensation. See 42 U.S.C.A. §12112 (1995). Disability discrimination claims brought pursuant to the ADA are governed by the same legal standards, and thus will be evaluated using the McDonnell Douglas burden-shifting test. See Parker v. Columbia Pictures Indus., 204 F.3d 326, 332 n.1 (2d Cir.2000) (ADA evaluated same way); Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir.1998) (McDonnell Douglas test used for ADA claims).

To establish a _prima facie_ case of discriminatory termination on account of a disability under the ADA, a plaintiff must demonstrate that: (1) the defendant employer is covered by the statute;[7] (2) he suffers from a disability as defined by the ADA; (3) plaintiff was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action as a result of his disability. See _Felix v. New York City Transit Auth._, 324 F.3d 102, 104 (2d Cir.2003); _Giordano v. City of New York_, 274 F.3d 740. 747 (2d Cir.2001); _Ryan v. Grae & Rybicki, P.C._, 135 F.3d 867 (2d Cir. 1998). Once a plaintiff has stated a prima facie case of discrimination, the defendant must proffer a legitimate, non-discriminatory reason for dismissing the plaintiff. If the defendant satisfies this requirement, the burden then shifts back to the plaintiff to rebut defendant's proffered reason by demonstrating that the defendant's explanation is either pretextual or not worthy of credence. See _Tomka v. Seiler_, 66 F.3d 1295, 1308 (2d Cir. 1995).

Defendant argues that plaintiff's ADA claim fails as a matter of law on three distinct grounds. First, defendant asserts that plaintiff has failed to show that he had a "disability" as defined by the ADA. Second, defendant claims that it provided reasonable accommodations, as requested by the plaintiff. Finally, defendant

---

[7] There is no dispute that defendant is subject to the provisions of the ADA since it employs more than 15 people. See 29 C.F.R. § 1630.2(e)(1) (2005).

contends that plaintiff cannot show that defendant's reasons for his discharge was a pretext for discrimination.

### A.  Plaintiff has failed to establish that he is a disabled person within the meaning of the ADA

Plaintiff's complaint asserts that he is disabled as a result of his general anxiety disorder and panic attacks. <u>See</u> Complaint ("Compl.") ¶19. While there is no dispute that plaintiff suffers from general anxiety disorder, it is well settled under federal law that the ADA requires more than a diagnosis of a condition for a person to be considered disabled as that term is defined under the Act. <u>See</u> <u>Toyota Motor Mfg., Kentucky, Inc. v. Williams</u>, 534 U.S. 184, 198 (2002) (holding that "[i]t is insufficient for individuals attempting to prove disability status ... to merely submit evidence of a medical diagnosis of impairment").

The ADA defines a disability as: "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." <u>See</u> 42 U.S.C. §12102(2). Regulations promulgated under the Act define "Major life activities" to include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." <u>See</u> 29 C.F.R. § 1630.2(I) (2004); <u>see also</u> <u>Buckley v. Consolidated Edison Co. of New York, Inc.</u>, 155 F.3d 150 (2d Cir. 1998)(en banc). To be "substantially impaired" from performing a major life activity, a plaintiff must have an impairment

that "prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." See Toyota, 534 U.S. at 197. Moreover, "[t]he impairment's impact must also be permanent or long term." See id.; see also 29 C.F.R. §1630.2(j)(1)(I)-(ii)(A major life activity is substantially limited when an individual cannot perform an activity that an average person in the general population could perform, or faces significant restrictions in the "condition, manner, or duration under which the individual can ... perform [the] activity").

Accordingly, to establish the existence of a disability, a plaintiff must demonstrate that he or she suffers from a physical or mental impairment that "substantially limits one or more major life activities ...." See 42 U.S.C. § 12102(2)(A); see also Buckley, 155 F.3d at 150 (plaintiff must also show that his impairment substantially limited him in performing one or more major life activities); Reeves v. Johnson Controls World Services, Inc., 140 F.3d 144, 152 (2d Cir. 1998) ("The need to identify a major life activity that is affected by the plaintiff's impairment plays an important role in ensuring that only significant impairments will enjoy the protection of the ADA"). Therefore, the threshold question for determination in this case is whether or not plaintiff's general anxiety disorder constitutes a disability under the ADA.[8]

---

[8]The determination of whether or not a person suffers a disability under the ADA "is an individualized inquiry" that does not rest on the mere diagnosis of an impairment. See Sutton v. United Airlines, 527 U.S. 471, 483 (1999). Instead, courts are to look to "the effect of [an] impairment on the life of the individual." See 29 CFR pt. 1630, App. § 1630.2(j); see also Reeves, 140 F.3d at 151 ("disability determinations to be made on an individualized

<u>Major Life Activities - Working</u>

Although plaintiff does not specifically articulate that his general anxiety disorder substantially limited him in the major life activity of "working," I will nonetheless broadly construe his Complaint to include that argument since he is a *pro se* plaintiff. See <u>Wernick v. Fed. Reserve Bank of New York</u>, 91 F.3d 379, 383 (2d Cir. 1996) (Where plaintiff failed to specifically allege which major life activities were affected by her impairment, district court properly concluded that function at issue was ability to work). Nonetheless, plaintiff has still failed to produce any evidence that his disorder substantially limited his ability to perform the major life activity of "working."

An individual is not substantially limited in the major life activity of working for purposes of the ADA unless he is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs". See 29 C.F.R. § 1630.2(j)(3)(I); <u>see also</u> <u>Ryan</u>, 135 F.3d at 872. An individual's inability to perform only his or her current job is not a substantial limitation on the major life activity of working. See <u>Wernick</u>, 91 F.3d at 383-4. Moreover, generalized anxiety disorder is not a covered disability under the ADA. See <u>Logan v. Potter</u>, 2007 WL 1652268 ay *4 (D.N.J.2007); <u>see also</u> <u>Paleologos v. Rehab Consultants, Inc.</u>, 990 F.Supp. 1460 (N.D.

case-by-case basis)[.]")

Ga. 1998) (stress caused by interaction with a supervisor or co-workers does not constitute a disability under the ADA).

Further, plaintiff has come forward with no evidence to show that his general anxiety disorder substantially limited his performance of any major life activity. Here, plaintiff contends that, at times, his anxiety disorder prevented him from driving, traveling, sleeping, concentrating and visiting clients to make sales calls. Nonetheless, with the exception of a few days off in February, March and April, plaintiff made it into work and do his job. The evidence shows that plaintiff's anxiety disorder made performing his job functions difficult, but not impossible. In addition, while plaintiff's treating physician diagnosed plaintiff with general anxiety disorder, the doctor never requested that plaintiff take a full leave from work. The physician merely requested that Giallanza have a flexible work schedule. The record reflects that TWC did provide the accommodation recommended by Giallanza's treating physician. As a result, plaintiff has not shown how his condition substantially limits his major life activities. See 42 U.S.C. §12101(2)(A).

Plaintiff has failed to produce any evidence showing that he had an impairment which significantly limited him from performing any major life activity. In addition, plaintiff has not alleged that he is unable to work in any specific job, much less a broad class of jobs. Accordingly, plaintiff has failed to show *prima facie* that he suffered from any "disability" as that term is defined in the ADA.

Thus, plaintiff's ADA claim fails as a matter of law and summary judgment is granted in favor of defendant.

## B.    Plaintiff's Failure to Accommodate Claim

Assuming however that plaintiff is disabled, the next areas of contention concern plaintiff's qualifications to perform his job at TWC and defendant's efforts to accommodate plaintiff's disability. According to the ADA, a disabled individual is "otherwise qualified" to perform a job if "with or without reasonable accommodation, [he] can perform the essential functions of the employment position that such individual holds or desires." See Lyons v. Legal Aid Society, 68 F.3d 1512, 1514 (quoting 42 U.S.C. §12111(8)); see also Teahan v. Metro-North Commuter R.R., 80 F.3d 50, 53-54 (2d Cir. 1996). In these types of cases, the Second Circuit requires a plaintiff to show in his *prima facie* case that "he can perform the essential functions of the job in spite of the handicap either (a) with no need for accommodation, or (b) with a reasonable accommodation." See Gilbert v. Frank, 949 F.2d 637, 642 (2d Cir. 1991). Plaintiff may meet this burden by showing "evidence as to his or her individual capabilities and suggestions for some reasonable assistance or job modification by the employer." See id. The court must "make an individualized inquiry into whether the plaintiff is otherwise qualified for the job in question." See id. After plaintiff establishes a *prima facie* case, the burden shifts to the employer "to show that no reasonable accommodation is possible." See id. The employer carries the ultimate burden of proof on the issue of reasonable accommodation. See id.

The ADA does not provide a "closed-end definition" of reasonable accommodation, but the law under the ADA is consistent. See Lyons, 68 F.3d at 1515. The Second Circuit held that reasonable accommodation "does not require the perfect elimination of all disadvantage that may flow from the disability; it does not require a lowering of standards, ... nor that the employer make fundamental or substantial modifications in order to eliminate the disadvantages flowing from the disability." See Fink v. New York City Dep't of Personnel, 53 F.3d 565, 567 (2d Cir. 1995) (citations and quotations omitted). Further, the law "does not require the employer to provide every accommodation the disabled employee may request, so long as the accommodation provided is reasonable." See id. Importantly, reasonable accommodation does not require the employer to eliminate any of the job's essential functions. See Gilbert, 949 F.2d at 642.

Here, even if plaintiff is disabled within the meaning of the ADA, any failure to accommodate claim still fails because it is undisputed that plaintiff did not specifically ask for any accommodation other than a flexible work schedule recommended by his doctor. As requested, TWC granted plaintiff's request for flexibility regarding his start time. In addition, plaintiff could not perform the essential functions of his job with or without the accommodation provided by TWC. Plaintiff's position as an AE was described as having "essential duties and responsibilities," among others, "to secure new advertising clients," "perform extensive unsolicited calling to develop client list" and "meet defined sales quotas and

goals." In addition, the job description states that the "physical demands" of the position include making frequent in-person sales calls and driving a car. By February 2005 it was difficult for Giallanza to function and as a result, plaintiff was absent from work for several days and sold only 63% of his budget. In March 2005 plaintiff was out of the office for nine work days, only sold 65% of his budget and brought in a marginal amount of new business. Plaintiff missed another five days of work in April and accordingly only sold 59% of his budget. At this point, plaintiff had failed to meet his budget three months in a row. Moreover, plaintiff was unable to respond to clients in a timely manner, concentrate on client requests or complete the required number of client calls each week. Plaintiff requested an accommodation that he be allowed to work a flexible schedule in May 2005, which was granted by TWC. Following the grant of accommodation, plaintiff still continued to be unable to travel, make the required number of sales calls or sell enough advertisements to meet his budget. In May 2005, plaintiff sold under his monthly budget by 29%. From June through August plaintiff sold under budget i.e. in June 2005 plaintiff sold only 50% of his budget, in July 2005 he again sold only half of his budget and in August 2005 plaintiff was under selling by 27% of his budget. Moreover, between June and September 2005, plaintiff remained fearful of going on sales meetings and traveling. Significantly, at his deposition, plaintiff admitted that he was unable to perform the essential functions of his job, one of which was the ability to interact with clients and sell

despite being granted his requested accommodation. Thus, plaintiff is unable to establish a failure to accommodate claim under the ADA.[9]

### C. Plaintiff has failed to state a prima facie case of disability discrimination

As mentioned above, ADA claims are governed by the same legal standards as discrimination claims using the McDonnell Douglas burden-shifting test.[10] Under this test, for plaintiff to prevail he must establish a *prima facie* case of disability discrimination by showing: (1) he is disabled; (2) with or without reasonable accommodation, he was able to perform the essential functions of his position; and (3) adverse employment action was taken against him under circumstances giving rise to an inference of discrimination. See McDonnnell Douglas Corp., 411 U.S. at 802; 42 U.S.C. § 12111(8). Assuming the first two factors have been met by plaintiff, the Court will evaluate the third factor.

In this case, as discussed previously, the Court has found that TWC has met its burden of proof since plaintiff was unable to perform

---

[9]It should also be noted that an employer cannot be held liable for discontinuing accommodations for or discharging an employee who cannot perform the essential job functions. See Trobia v. Henderson, 315 F.Supp.2d 322, 333-334 (W.D.N.Y.2004) ("the fact that [employee] worked in the [position] for a period of time, although unable to perform all the essential functions of that job did not create any vested rights to continue to do so"). Here, TWC accommodated plaintiff and allowed him to work under budget for a period of a few months. However, as the case law provides, TWC was not obligated to continue to grant plaintiff an accommodation indefinitely.

[10]Claims of discrimination are analyzed under the well-recognized burden shifting framework set forth in McDonnell Douglas, 411 U.S. at 792 and later refined in Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248 (1981) and St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993). Under the McDonnell Douglas test, the plaintiff bears the burden of proving a prima facie case of discrimination. If plaintiff succeeds in stating a prima facie case, the burden of production shifts to defendant to state a legitimate, non-discriminatory reason for taking the employment action at issue. Should the employer meet that burden, the burden of production then shifts back to plaintiff to show that the reasons proffered by the employer were not the true reasons for the adverse employment action, but instead were a pretext for discrimination, and that discrimination was the real reason. See Hicks, 509 U.S. at 502-06.

the essential functions of his job, with or without reasonable accommodations. Accordingly, following Hicks, plaintiff bears the ultimate burden of showing that defendant's proffered reasons for his discharge were "a pretext for discrimination." See Hicks, 509 U.S. at 515. To carry this burden, plaintiff must prove "both that the [articulated] reason [for discharge] was false, and that discrimination was the real reason." See id. Plaintiff has failed to provide evidence of animus toward him based on his disability. Indeed, defendant allowed plaintiff to remain employed long after he was unable to perform the essential functions of his job including his failure to meet his budgets by wide margins. See Mercado v. NYC Housing Authority, 1998 WL 151039 at *14 (S.D.N.Y.1998) (Record did not support any contention that [plaintiff's] supervisors harbored discriminatory animus toward him).

### III. **Plaintiff's Retaliation Claim**

Retaliation discrimination claims are also analyzed under the McDonnell Douglas burden-shifting test. See McDonnell Douglas, 411 U.S. at 802. A prima facie case of retaliation requires the plaintiff to prove: (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and adverse action. See Holt v. KMI-Continental, 95 F.3d 123, 130 (2d Cir. 1996); see also Trobia, 315 F.Supp.2d 322. The defendant then has the opportunity to articulate a non-discriminatory legitimate reason for the employment action and the plaintiff has the burden to show that

the employer's articulated reason is both untrue and a pretext for the true discriminatory motive. See Holt, 95 F.3d at 130. Plaintiff claims that defendant retaliated against him because he "complained about harassment directed toward" him. See Compl. ¶13. While it is undisputed that plaintiff's complaint of discrimination against him to the Human Resources Department on his last day of employment is a protected activity, this cannot form the basis of a retaliation claim because he complained to Human Resources *after* TWC already informed him of his termination. Plaintiff was informed of his termination on September 28, 2005 and he complained of the alleged discrimination sometime in October 2005. Accordingly, plaintiff cannot demonstrate a causal connection between the protected activity and the adverse action. Because the alleged adverse employment action occurred before plaintiff complained, plaintiff cannot establish a *prima facie* case of retaliation and thus his retaliation claim fails as a matter of law. I therefore grant defendant's motion for summary judgment with respect to this claim.

### IV. <u>Plaintiff's National Origin Claim</u>

Finally, in §14 of the Complaint plaintiff states that TWC's "conduct is discriminatory with respect to" his national origin. Defendant moves for summary judgment to dismiss the national origin claim on the grounds that the claim lacks both factual and legal support. To establish a *prima facie* case of discrimination based on national origin, plaintiff must show the same factors under the <u>McDonnell Douglas</u> framework. Here, plaintiff contends that TWC may

have discriminated against him based on his national origin because he was born in Sicily, Italy. However, plaintiff acknowledged that he is not really sure if LaBue had discriminatory animus against Italians, but that it might be one of the motives she had. In addition, neither LaBue nor any other employee made any comments to plaintiff about his Italian national origin. Further, none of them made any ethnic slurs toward plaintiff. Thus, plaintiff's national origin claim fails as a matter of law and the Court grants defendant's summary judgment motion.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted, and plaintiff's Complaint is dismissed with prejudice.

**ALL OF THE ABOVE IS SO ORDERED.**

s/Michael A. Telesca
Michael A. Telesca
United States District Judge

DATED:    Rochester, New York
          March 30, 2009